AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Northern District of California

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| BRIAN GALINDO-BORJAS AND | ) | Case No.  3:24-mj-70848 MAG |
| MARK KAPSALIS | ) | |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

**FILED**

Jun 04 2024

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____June 3, 2024_____ in the county of _____San Francisco_____ in the

_____Northern_____ District of _____California_____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 USC 841(a)(1) and (b)(1)(C) | Possession with intent to distribute fentanyl |

This criminal complaint is based on these facts:

See attached affidavit of DEA Special Agent Mark J. Gonzalez

☑ Continued on the attached sheet.

Approved as to form /s/ Ryan Rezaei
AUSA RYAN REZAEI

_____/S/ MARK J. GONZALEZ_____
*Complainant's signature*

_____Mark J. Gonzalez, DEA Special Agent_____
*Printed name and title*

Sworn to before me by telephone.

Date:  _____06/03/2024_____

_____
*Judge's signature*

City and state:  _____San Francisco, CA_____

_____Lisa J. Cisneros, U.S. Magistrate Judge_____
*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR AN
## ARREST WARRANT AND CRIMINAL COMPLAINT

I, Mark Gonzalez, a Special Agent with the Drug Enforcement Administration (DEA) having been duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.      I make this affidavit in support of an application for an arrest warrant and criminal complaint charging Brian GALINDO-BORJAS and Mark KAPSALIS with 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), based on their possession with the intent to distribute the following controlled substance: a mixture and substance containing a detectable amount of N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propenamide (fentanyl), on or about June 3, 2024, in San Francisco, California, in the Northern District of California.

### SOURCES OF INFORMATION

2.      The facts in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents, officers, and witnesses. Where statements made by other individuals (including other Special Agents and law enforcement officers) are referenced in this Affidavit, such statements are described in sum and substance and in relevant part. Similarly, where information contained in reports and other documents or records is referenced in this Affidavit, such information is also described in sum and substance and in relevant part.

3.      Because this Affidavit is submitted for the limited purpose of establishing probable cause for a criminal complaint and arrest warrant, I have not included every fact known to me about this case.  Rather, I have set forth only the facts that I believe are necessary to support probable cause for a criminal complaint and arrest warrant.  My understanding of the facts and circumstances of the case may evolve as the investigation continues.

### AFFIANT BACKGROUND

4.      I am a Special Agent (SA) of the DEA, within the United States Department of Justice, and have been so employed since May of 2021.  I am currently assigned

to investigate drug trafficking organizations as a member of the DEA's San Francisco Division Metro Task Force Group 1.

5.     I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).  I am empowered by law to conduct investigations, to execute search warrants, and to make arrests for offenses of Federal law, including violations of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

6.     Prior to my employment with the DEA, I was a police officer in Hartford, Connecticut for approximately four years.  I served in numerous roles including patrol and the Street Crimes Unit, a specialized unit predicated on combating violent crime and street level narcotic transactions.  I also completed my Bachelor of Science Degree in Criminal Justice in 2015.

7.     As a DEA Special Agent, I have assisted in the execution of search warrants for controlled substances and/or related paraphernalia, and other evidence of violations of federal drug statutes.  I have participated in investigations targeting individuals and organizations trafficking controlled substances as defined in Title 21, United States Code, Section 802(6).

8.     I received 17 weeks of specialized drug law enforcement training at the DEA training academy in Quantico, Virginia, from May 2021 to September of 2021.  This training included several hundred hours of comprehensive, formalized instruction in, but not limited to, narcotics investigations, drug identification, detection, identification and seizure of drug-related assets, undercover operations, and electronic and physical surveillance procedures.  This training included instruction in the investigation of federal drug violations, including, but not limited to Title 21, United States Code, Sections 841 and 846.

9.     Through my training, experience, and interaction with other experienced Special Agents, Task Force Officers, and other drug investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute

drugs, and to collect and conceal drug-related proceeds, and to communicate with other participants to accomplish such objectives.

10.     I have personally participated in the investigation discussed in this affidavit.  I am familiar with the facts and circumstances of the investigation through my personal participation in it based on several investigative techniques, including discussions with agents of the DEA and with other law enforcement agencies, and review of records and reports relating to the investigation.  Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the statement is not being recounted verbatim but instead only in substance and in part.  Facts not set forth herein, or in any attached exhibits, are not being relied on in reaching my conclusion that the requested order should be issued.  Nor do I request that this Court rely on any facts not set forth herein in reviewing this application.

## APPLICABLE STATUTE

11.     **Possession of Controlled Substance with Intent to Distribute**.  Under Title 21, United States Code, Sections 841(a)(1) and (b)(1)(C), it is unlawful for any person to knowingly or intentionally possess with intent to distribute a federally controlled substance.  Under 21 C.F.R. § 1308.12, fentanyl is a Schedule II controlled substance.

## STATEMENT OF PROBABLE CAUSE

12.     On or about June 3, 2024, Brian GALINDO-BORJAS, hereinafter "GALINDO," and Mark KAPSALIS were arrested by agents from DEA and the Federal Bureau of Investigation (FBI) in the vicinity of 100 Larkin Street in San Francisco, California, in the Northern District of California.  Based on the facts described below, there is probable cause that GALINDO and KAPSALIS violated 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), based on their possession with intent to distribute a mixture and substance containing a detectable amount of N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propenamide (fentanyl).

13.     On or about June 3, 2024, at approximately 1:04 a.m., law enforcement personnel began conducting surveillance remotely in the vicinity of a live video surveillance device.  I personally reviewed the survillance video described below.  The vicinity of 100 Larkin

Street is located within San Francisco's Tenderloin district – an area known for open-air narcotics trafficking at all hours of the day and night.  At the time of the surveillance, the sidewalk was crowded with numerous people, at least several of whom appeared to be engaged in drug-related activity.

14.    At approximately 1:04 a.m., law enforcement personnel observed a male, wearing a blue jacket, black facemask and black pants, later identified as GALINDO, placing an off-white substance on to a digital scale.  Two unidentified individuals step in front of GALINDO, placing him out of view of the camera, however, GALINDO is observed placing two separate clear plastic bags containing the off-white substances he was just weighing into a backpack.  The backpack was being worn by a white male wearing a gray sweatshirt, later identified as KAPSALIS.  I believe GALINDO was weighing a controlled substance and preparing that substance for sale.  I know from training and experience that drug dealers in the Tenderloin will pre-package controlled substances for sale, and that drug dealers, in an attempt to insulate themselves from law enforcement detection, have others – the bag holders – carry the controlled substances.

15.    At approximately 1:05 a.m., GALINDO is observed counting what appears to be U.S. Currency.  Seconds later, GALINDO is approached by an unidentified individual wearing all black.  GALINDO is then observed reaching back into the backpack that KAPSALIS is wearing and retrieves from the backpack what appears to be a digital scale and a clear plastic bag containing and off-white substance.  GALINDO then weighs the off-white substance on the digital scale and then places both the scale and the off-white substance back inside the backpack KAPSALIS is wearing and retrieves another plastic bag containing an off-white substance.  GALINDO is observed inspecting the bag containing the off-white substance, and appears to take a piece of it and hand to another unidentified male wearing a red t-shirt.  Shortly after, GALINDO places the off-white substance back inside the backpack KAPSALIS is wearing.  The male wearing the red t-shirt then hands GALINDO what appears to be U.S. Currency, which GALINDO begins to count.  GALINDO then goes back inside the backpack,

grabs an off-white substance contained in a plastic bag and digital scale and begins to weigh the off-white substance. GALINDO then appears to place the off-white substance he was just weighing inside another clear plastic bag which he then hands to the male wearing the red t-shirt. GALDINDO then places the off-white substance back inside the back pack. I believe that GALINDO sold a controlled substance to the male wearing the red t-shirt.

16.     At approximately 1:09 a.m., GALINDO is approached by another individual wearing all black that is out of view of the camera. GALINDO then performs the same actions as described above, retrieving the off-white substances and scale from the backpack that KAPSALIS is wearing and weighs them. The unidentified individual wearing all black then appears to hand GALINDO U.S. Currency as GALINDO hands the individual a clear knotted plastic bag. I believe GALINDO sold the unidentified individual a controlled substance.

17.     Moments later, at approximately 1:10 a.m., GALINDO sits down next to KAPSALIS.

18.     Based on my training, experience, and knowledge of the investigations, the above described behaviors are consistent with a hand to hand transaction of street level narcotics.

17.     Based on the above, law enforcement believed probable cause existed to arrest GALINDO and KAPSALIS for a violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).

18.     At approximately 1:17 am, law enforcement personnel converged on the defendants' location, identified themselves as law enforcement, and detained KAPSALIS and GALINDO for further investigation. Law enforcement confirmed that the individuals taken into custody were the same persons viewed during the surveillance described above.

19.     Law enforcement arrested GALINDO and KAPSALIS for the distribution of controlled substances viewed on the camera, and they were searched incident to arrest. Law enforcement recovered approximately $4,129.45 of U.S. Currency on GALINDO's person, as well as numerous plastic bags typically used for street level drug distribution. It should be noted that the U.S. Currency located was broken up into mixed denominations. Based

on my training and experience, I know that the denominational structure is consistent with narcotics proceeds.

20.     Pursuant to KAPSALIS's arrest, law enforcement personnel conducted a search of KAPSALIS's person and located 10 grams of an off-white substance suspected to be fentanyl.  Based on my training and experience, individuals involved in drug trafficking, such as GALINDO, will utilize other individuals, such as KAPSALIS, to hold their controlled substances as a method to evade arrest for possession of a controlled substance on their person. It is my belief that GALINDO was working in conjunction with KAPSALIS to hold GALINDO's drugs in an attempt to distance GALINDO from the drugs in order to attempt to evade or avoid prosecution when arrested by law enforcement.   Furthermore, based on my training and experience, individuals in KAPSALIS's role are typically paid with user amounts of narcotics for their services, such as the amount located on KAPSALIS's person.

21.     At the scene of the arrest, law enforcement personnel conducted a search of KAPSALIS person incident to arrest and located the following:

   i.   2 small clear plastic bags containing off white substances suspected to be fentanyl, which was determined to weigh approximately 10 grams (including packaging) and tested positive for fentanyl (using a TruNarc device), pictured below:



22.     At the scene of the arrest, law enforcement personnel conducted a search of the backpack KAPSALIS was holding incident to arrest and located the following:

      i.    Multiple clear plastic bags containing off-white substances suspected to be fentanyl, which was determined to have a total weight 1348.8 grams (including packaging) and which tested positive for fentanyl (using a TruNarc device), pictured below:



ii.  4 clear plastic bags containing off-white crystal-like substances
     suspected to be methamphetamine, which was determined to weigh
     approximately 1239.8 grams (including packaging) and which
     tested positive for methamphetamine (using a TruNarc device),
     pictured below:



iii.    1 pill bottle labeled "Alprazolam" containing suspected Xanax pills, which was determined to weigh approximately 76.2 grams (including packaging) (this was not tested), pictured below:



iv.    1 clear plastic bag containing a brown substance, suspected to be heroin which was determined to weigh approximately 47.3 grams (including packaging) (this was not tested), pictured below:



v.    1 clear plastic bag containing an off-white substance, suspected to be cocaine HCL which was determined to weigh approximately 6.5 grams (including packaging) and which tested positive for cocaine HCL (using a TruNarc device), pictured below:



vi.    2 clear plastic bags containing an off-white substance, suspected to be cocaine base which was determined to weigh approximately 41.2 grams (including packaging) and which tested positive for cocaine HCL (using a TruNarc device), pictured below:



vii.    3 clear plastic bags containing a brown substance, suspected to be heroin which was determined to weigh approximately 200.5 grams (including packaging), pictured below:



viii.    2 clear plastic bags containing blue pills labeled "M" on one side and "30" on the other suspected to be counterfeit pills which was determined to weigh approximately18.6 grams (including packaging), pictured below:



23.     The substances described in paragraphs 21(i) and 22(i), (ii), (v), and (vi) above were tested using a Tru-Narc devices.  All of these substances tested presumptively positive for the substance listed in the respective paragraph.

24.     Based on, among other things, my training and experience, what law enforcement observed, and the amounts of controlled substances that were located on KAPSALIS and inside his backpack (that GALINDO had access to) when they were arrested on or about June 3, 2024, I believe that GALINDO and KAPSALIS possessed the suspected narcotics for purposes of distribution as opposed to mere personal use.  In addition, the suspected fentanyl was packaged into several plastic baggies, which I know based on my training and experience is a common method of packaging for distribution.  The location of the arrest in San Francisco's Tenderloin District, an area known for a high volume of narcotics trafficking activity, further supports my conclusion that GALINDO and KAPSALIS possessed the narcotics, including fentanyl, for the purpose of distribution or sale.

## CONCLUSION

25.     Based on the facts and circumstances set forth above, there is probable cause to believe that on or about June 3, 2024, in the Northern District of California, GALINDO and KAPSALIS possessed with the intent to distribute a mixture and substance containing a detectable amount of N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propenamide (fentanyl),

in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C).  Accordingly, I respectfully request that the Court issue a criminal complaint and a warrant for their arrests.


/s/ *Mark Gonzalez*
_____

Mark. J. Gonzalez
Special Agent
Drug Enforcement Administration


Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 4(d) on this 3rd day of June 2024.

_____

HONORABLE LISA J. CISNEROS
United States Magistrate Judge